**ORIGINAL**

FILED IN CLERK'S OFFICE
U S D C   Atlanta

OCT 2 5 2007

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, On behalf of Itself and All Others Similarly Situated,<br><br>    Plaintiff<br><br>v.<br><br>PIEDMONT OFFICE REALTY TRUST, INC. (f/k/a WELLS REAL ESTATE INVESTMENT TRUST, INC.), W. WAYNE WOODY, MICHAEL R. BUCHANAN, WESLEY E. CANTRELL, WILLIAM H. KEOGLER, JR., DONALD S. MOSS, and DONALD A. MILLER,<br><br>    Defendants | CASE NO. **1:07-CV-2660 CAP**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTIES**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      **FACTUAL BACKGROUND** ...................................................................1

II.     **JURISDICTION AND VENUE** ...........................................................7

III.    **PARTIES** ...............................................................................................7

     A.    **Plaintiff** ......................................................................................7

     B.    **Nominal Defendant Piedmont Office Realty Trust, Inc.**
             **(f/k/a Wells Real Estate Investment Trust, Inc.)** ..................8

     C.    **Director Defendants** ................................................................12

           1.    W. Wayne Woody...........................................................12

           2.    Michael R. Buchanan....................................................12

           3.    Wesley E. Cantrell.........................................................13

           4.    William H. Keogler, Jr..................................................13

           5.    Donald S. Moss .............................................................13

           6.    Donald A. Miller ...........................................................13

IV.    **CLASS ACTION ALLEGATIONS** ....................................................15

V.     **SUBSTANTIVE ALLEGATIONS** ......................................................18

     A.    **Listing and Underwritten Offering Announcement** ...............19

     B.    **The May 25 Lex-Win Tender Offer**.......................................20

i

1.    **Piedmont's Schedule 14D-9 Responds to the Lex-Win Tender Offer** .................................................................23

2.    **Lex-Win Increases the Price and Number of Shares in a Supplement to the May 25 Lex-Win Tender Offer** ..................26

3.    **Piedmont Amends its Schedule 14D-9** ...........................................28

C.    **The Final Proxy** .................................................................................33

1.    **Background to the Final Proxy** ....................................................33

2.    **Stated Reasons for the Board's Recommendation of the Proposal** ..................................................................................36

D.    **The Board of Directors Violated Federal Securities Laws By Filing Documents with the SEC that Were Materially False and Misleading And Omitted Material Facts** .....................................39

1.    **The Schedule 14D-9 and the Amended Response Failed to Disclose that the Board Knew that There was a High Likelihood that the Company Would Not List** ................40

2.    **The Final Proxy Contains Materially False and Misleading Statements Concerning the Reason for the Board's Decision to Delay the Listing and Extend the Liquidity Deadline** ....................................................................43

E.    **Director Defendants Breached The Fiduciary Duties Owed to the Shareholders by Acting Without Consideration to What Was in the Best Interests of the Shareholders** ...........................45

VI.    **COUNTS** .....................................................................................................47

VII.   **PRAYER FOR RELIEF** .........................................................................61

## <u>CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTIES</u>

Plaintiff, Washtenaw County Employees' Retirement System, a shareholder of Piedmont Office Realty Trust, Inc. (f/k/a Wells Real Estate Investment Trust, Inc. ("Wells REIT")) ("Piedmont" or "the Company"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Class Action Complaint ("Complaint") against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Piedmont, other regulatory filings and reports, industry analysts' reports about the Company, press releases and other public statements issued by the Company, reference to authoritative accounting literature and consultations with forensic accounting experts.

### I.    <u>FACTUAL BACKGROUND</u>

1.    This Action seeks to remedy the wrongdoing that was, and continues to be, inflicted against the shareholders of Piedmont who were presented with the opportunity to tender their shares of Piedmont stock for $9.30 per share and were told by their fiduciaries to reject the tender offer.

1

2.     Piedmont is an unlisted REIT with a fixed life.  Its Charter mandates that if its stock is not listed on a national securities exchange or over-the-counter market ("Listing") by January 30, 2008 ("Liquidity Deadline"), Piedmont must sell its assets and distribute the proceeds.  Piedmont's Charter does not require the Listing of its stock at a minimum market price; it only mandates a Listing by the Liquidity Deadline.

3.     On May 23, 2007, Piedmont (f/k/a Wells REIT) filed a Form S-11 Registration Statement ("May 23 Registration Statement") with the SEC announcing the Company's intention to apply to list its stock on the New York Stock Exchange and to conduct an underwritten offering of up to $345 million of its stock ("Underwritten Offering").  The announcement and SEC filings have not disclosed how many shares will be offered, nor have they provided an estimated price range.  The Listing and Underwritten Offering have not yet occurred.

4.     On May 25, 2007, Lex-Win Acquisition LLC ("Lex-Win"), unaffiliated to any Defendant, filed with the SEC a Tender Offer Statement on Schedule TO under Section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), to purchase up to 25,000,000 Piedmont shares (or approximately 5.2% of the outstanding shares of Piedmont) at $9.00 net per share for an aggregate purchase price of $225 Million ("May 25 Lex-Win Tender Offer").

2

5.      On June 8, 2007, Piedmont and its board of directors ("Board") filed a

Schedule 14D-9 Solicitation/ Recommendation Statement under Section 14(d)(4) of the

Exchange Act ("Schedule 14D-9") responding to the May 25 Lex-Win Tender Offer. The

Schedule 14D-9, at Item A(c), informed the Piedmont shareholders that the Board of

Directors had determined that the "[May 25 Lex-Win Tender] Offer was not in the best

interests of the stockholders of the Company and . . . recommend[ed] that the Company's

stockholders reject the [May 25 Lex-Win Tender] Offer and not tender their Shares to the

Offerors pursuant to the Offer."

6.      The Board's recommendation to reject the May 25 Lex-Win Tender Offer

was largely based on "the current business plan in effect for the future of the Company as

disclosed in the May 23 Registration, including a potential Listing of its shares of

common stock on a national exchange" and "the Board's belief that the timing of the

[May 25 Lex-Win Tender] Offer is intended to take advantage of any potential increase

in the value of the Company's shares associated with a possible Listing and trading of the

Company's shares on a national exchange."  These reasons for the recommendation were

repeated in the Board's letter to stockholders dated June 8, 2007, also filed with the SEC.

7.      On June 12, 2007, Lex-Win filed a supplement to its May 25 Tender Offer

by increasing the offer price to $9.30 per share and increasing the maximum number of

shares Lex-Win was seeking to acquire to 45,000,000, representing 9.3% of the

outstanding shares of the Company (("Revised Tender Offer"), collectively, the May 25 Lex-Win Tender Offer and Revised Tender Offer are referred to herein as "Lex-Win Tender Offer").

8.    On June 18, 2007, Piedmont filed with the SEC its Amendment No. 1 to its Schedule 14D-9, responding to the Revised Tender Offer and recommending to Piedmont shareholders that they reject the Revised Tender Offer ("Amended Response"). The Amended Response omitted any reference to the May 23 Registration Statement or the potential Listing as reasons for recommending against the Revised Tender Offer. The Amended Response did not explain why the May 23 Registration Statement or the potential Listing, which had been highlighted in Piedmont's June 8 Schedule 14D-9, were not mentioned at all in its June 18 Amended Response, or the significance of these omissions given the Board's continuing recommendation to the Class to not tender their shares to Lex-Win.

9.    After two extensions of the Lex-Win Tender Offer deadline, on July 20, 2007, the Lex-Win Tender Offer expired. Lex-Win accepted for purchase 4,816,548 shares, obtaining approximately 1% of the Company's outstanding shares.

10.    During the time that the Lex-Win Tender Offer was open and pending, the Director Defendants knew or wrongfully disregarded that a Listing of Piedmont's stock was highly unlikely.

4

11.     On August 10, 2007, Piedmont sent a letter to its shareholders stating publicly for the first time that a Listing would be unlikely. "[W]e will only pursue the listing if market conditions are appropriate. Given the challenging current market conditions, your Board, in consultation with its financial and investment banking advisors has reviewed and will continue to review all options to provide for liquidity and to maximize shareholder value." Piedmont stated that it will "continue to review market conditions and make decisions regarding liquidity options that we believe will maximize the long-term return of our shareholders."

12.     On October 16, 2007, Piedmont filed a Schedule 14A Proxy Statement, pursuant to Section 14(a) of the Exchange Act, stating that it was delaying the Listing and seeking an extension of the Liquidity Deadline from January 30, 2008 to July 30, 2009, and to provide the board of directors with the discretionary authority to extend the Liquidity Deadline further from July 30, 2009 to January 30, 2011, without further shareholder action. ("Final Proxy")

13.     At the time the Lex-Win Tender Offer was pending and prior to its expiration, the Director Defendants knew or wrongfully disregarded the fact that the Lex-Win Tender Offer represented a unique opportunity; it was a timely liquidity event and viable exit strategy for holders of up to 9.3% of the Company's stock. Motivated by a desire to avoid having Lex-Win or any other unaffiliated insider become a major

5

stockholder of the Company, the Director Defendants issued false and misleading recommendations to the Company's shareholders premised on false hopes of a Listing that the Director Defendants knew or wrongfully disregarded was highly unlikely.

14.    The Board is now asking the shareholders to vote on an amendment to the Charter that would mask their breaches of fiduciary duty and securities law violations.

15.    The Director Defendants continue to prioritize their own interests by seeking shareholder approval of an extension of the Liquidity Deadline which will tie up shareholders' investments for up to three more years, instead of providing liquidity by January 30, 2008 as was contractually promised.

16.    The Director Defendants were required, but failed, to act in accordance with the following directive, set forth in Piedmont's Charter: "The Directors serve in a fiduciary capacity to the Company and have a fiduciary duty to the Stockholders of the Company." The Director Defendants failed in their capacity as fiduciaries by recommending against acceptance of the Lex-Win Tender Offer at the price of $9.30 and by materially altering the reasons for their "reject" recommendations without clearly disclosing why the rationale for their recommendation had so significantly changed.

17.    This Complaint charges the Director Defendants with disseminating materially false and misleading Schedule 14D-9 Solicitation/ Recommendation Statements and a materially false and misleading Final Proxy in violation of Sections

6

14(a) and 14(e) of the Exchange Act, and/or breaching fiduciary duties under applicable state law. The claims are brought directly by the Plaintiff. This Complaint also seeks injunctive relief on behalf of the Class to prohibit Defendants from seeking any approvals from shareholders in response to the materially false and misleading Final Proxy that the Director Defendants disseminated to the Class.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. §§1331, 1337, and principles of supplemental and pendent jurisdiction.

19.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and certain of the Director Defendants have their principal places of business or reside within this District.

20.    In connection with the acts, conduct and other wrongs complained or herein, Director Defendants used the means and instrumentalities of interstate commerce.

## III.    PARTIES

### A.    Plaintiff

21.    Plaintiff Washtenaw County Employees' Retirement System ("Washtenaw County ERS" or "Plaintiff"), a citizen of Ann Arbor, Michigan, held 1,274,794.441

shares of Piedmont stock as of October 24, 2007, and continues to hold shares of

Piedmont stock, as set forth in the accompanying certification (Exhibit A). Washtenaw

County ERS was the recipient of the Lex-Win Tender Offer and in reliance on the

Director Defendants' recommendations did not tender any of its shares to Lex-Win.

Plaintiff seeks to represent all of the Company's shareholders (other than the Director

Defendants and their affiliates) who received or were otherwise offered to tender shares

in response to the Lex-Win Tender Offer ("Tender Offer Class"). Plaintiff is entitled to

vote on the Final Proxy and is, thus, a member of the Proxy Class. Washtenaw County

ERS continues to hold shares of Piedmont stock and this action is not collusive to confer

jurisdiction on a court of the United States, which it would not otherwise have.

Washtenaw County ERS has suffered substantial damages as a result of the Director

Defendants' wrongful acts, as alleged herein.

**B.** **Nominal Defendant Piedmont Office Realty Trust, Inc. (f/k/a Wells Real Estate Investment Trust, Inc.)**

22.     Piedmont Office Realty Trust, Inc. ("Piedmont") is a corporation organized

under the laws of the State of Maryland on July 3, 1997, with its principal executive

offices at 6200 The Corners Parkway, Norcross, Georgia. Piedmont is primarily engaged

in the acquisition and ownership of commercial real estate properties, including

properties that are under construction, newly constructed, or have operating histories. Its

8

portfolio consists primarily of high-grade office and industrial buildings leased to large corporate tenants located throughout the United States.  On April 16, 2007, Piedmont consummated a transaction to internalize the functions of Piedmont's advisor companies and became a self-managed entity (the "Internalization"). Effective August 10, 2007, the Company changed its name from Wells Real Estate Investment Trust, Inc. to Piedmont Office Realty Trust, Inc.

23.    Piedmont conducts business primarily through Piedmont Operating Partnership, LP ("Piedmont OP") (f/k/a Wells Operating Partnership, L.P.), a Delaware limited partnership. Piedmont is the sole general partner and possesses full legal control and authority over the operations of Piedmont OP.  Piedmont OP owns properties directly, through wholly owned subsidiaries, through certain joint ventures with real estate limited partnerships sponsored by its former advisor, and through certain joint ventures with third parties.

24.    From its formation through 2003, Piedmont raised capital through the issuance of common stock for $10 per share under four public offerings and invested the capital proceeds in income-producing commercial real estate properties. During 2004 and 2005, Piedmont continued to raise additional capital, through the sale of shares under its dividend reinvestment plan, and acquired or constructed certain additional real estate properties.  In total, Piedmont raised over $5 billion from investors, most of whom now

9

comprise the classes of shareholders for which the relief herein is sought. As of July 31, 2007, Piedmont had 488,137,438 shares of common stock outstanding held by a total of approximately 110,000 shareholders.

25.    Nominal Defendant Piedmont operates for federal income tax purposes as an equity real estate investment trust ("REIT"). An equity REIT is a business trust combining the capital of many investors to own and, in most cases, operate income-producing real estate. As a REIT, Piedmont is not treated for federal income tax purposes as a corporation, and thus, is not taxed at the corporate level on its "real estate investment trust taxable income" that is distributed to shareholders. Piedmont thereby eliminates "double taxation" on its earnings. In order to qualify as a REIT, Piedmont must comply with a number of requirements and provisions within the Internal Revenue Code, including that it must:

(a)    pay at least 90 percent of its taxable income to shareholders;

(b)    derive most of its income from real estate held for the long term;

(c)    operate or manage its assets through a Taxable REIT Subsidiary ("TRS") which can be wholly owned by the REIT; and

(d)    be widely held.

26.    Piedmont's business model is fundamental. It takes the money raised and acquires the most durable of assets – real estate, a long-lived physical asset with the

potential to produce income. Piedmont's primary responsibility is to preserve and protect the equity or value of Piedmont's real estate assets.

27.    According to Piedmont's Charter, its primary investment objectives are to maximize cash dividends paid to investors; to preserve, protect, and return investors' capital contributions; to realize growth in the value of properties upon the ultimate sale of such properties; and to ultimately provide the shareholders with liquidity for their investment by Listing shares on a national stock exchange, or, if the Listing of the shares does not occur by January 30, 2008, to sell the properties and distribute the net proceeds from such sales to Piedmont's shareholders.

28.    As of June 30, 2007, Piedmont owned interests in 82 buildings, either directly or through joint ventures, comprising approximately 21.0 million square feet of commercial office and industrial space, located in 23 states and the District of Columbia. As of June 30, 2007, these properties were approximately 94% leased.  To date, Piedmont has financed its acquisitions through a combination of equity raised in public offerings and debt incurred or assumed upon the acquisition of certain properties.

29.    Reminiscent of the real estate limited partnerships of two decades ago, Piedmont is a public unlisted REIT, meaning that, (1) it is *public* because it is registered with the SEC, can sell to the investing public rather than only to "qualified investors" and is required to file reports with the SEC; and (2) it is *unlisted* because its securities are not

11

listed on a national stock exchange. While Piedmont stock is unlisted, an investor wanting liquidity is limited to selling his shares back to Piedmont (whose stock redemption program is limited by tax regulations) or on an inefficient secondary market.

30.     Piedmont is named as a Defendant because it is the instrumentality and means used by the Director Defendants to disseminate false and misleading information to the shareholders.   No monetary damages are sought from Piedmont.

## C.     **The Director Defendants**

### 1.     **W. Wayne Woody**

31.     Defendant W. Wayne Woody ("Woody") has served as a director of Piedmont since 2003 and has been serving as Chairman of the Board since May 9, 2007. Defendant Woody is currently the chairman of the Audit Committee and serves as a member of the Compensation Committee, Nominating and Corporate Governance Committee, Capital Committee and the Conflicts Committee.

### 2.     **Michael R. Buchanan**

32.     Defendant Michael R. Buchanan ("Buchanan") has served as a director of Piedmont since 2002. Defendant Buchanan is currently the chairman of the Capital Committee and serves as a member of the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee and the Conflicts Committee.

### 3.    Wesley E. Cantrell

33.    Defendant Wesley E. Cantrell ("Cantrell") has served as a director of Piedmont since May 9, 2007. Defendant Buchanan currently serves as a member of the Capital Committee, Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee and the Conflicts Committee.

### 4.    William H. Keogler, Jr. ("Keogler")

34.    Defendant William H. Keogler, Jr. ("Keogler") has served as a director of Piedmont since 1998. Defendant Keogler currently serves as a member of the Capital Committee, Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee and the Conflicts Committee.

### 5.    Donald S. Moss ("Moss")

35.    Defendant Donald S. Moss ("Moss") has served as a director of Piedmont since 1998. Defendant Moss is currently the chairman of the Compensation Committee and the Nominating and Corporate Governance Committee and serves as a member of the Audit Committee, the Capital Committee and the Conflicts Committee.

### 6.    Donald A. Miller ("Miller")

36.    Defendant Donald A. Miller ("Miller") has served as Piedmont's Chief Executive Officer, President and as a director since February 2, 2007. On February 2,

13

2007, the Company entered into an employment agreement with Defendant Miller to act as the Company's Chief Executive Officer and President.

37.    Defendants Woody, Buchanan, Cantrell, Keogler, Moss and Miller comprise the current Piedmont Board of Directors and are collectively referred to herein as the Company's "Board of Directors" and "Director Defendants."

38.    In addition to their direct involvement with the wrongs complained of herein, by reason of their management positions, and/or membership on Piedmont's Board of Directors, and their authority and ability to make public statements in the name of Piedmont, the Director Defendants were controlling persons of Piedmont and had the power to cause (and did cause) Piedmont to engage in the conduct complained of herein.

39.    Because of their Board memberships and/or executive and managerial positions with Piedmont, each of the Director Defendants had access to the non-public and undisclosed information with respect to Piedmont's operations and financial condition, and ability to cause and direct that such information be disseminated, and to promptly correct any previously disseminated information that was false and misleading to the Company's investors

40.    Each Director Defendant is liable as a primary violator for making false and misleading statements that operated to mislead Piedmont shareholders in exercising their right to tender their shares pursuant to the Lex-Win Tender Offer as well as any false and

14

misleading statements that solicit shareholder votes to approve the extension of the

Liquidity Deadline.

## V.    CLASS ACTION ALLEGATIONS

41.    This is a class action pursuant to Rule 23(a), (b)(2) and/or (b)(3) of the

Federal Rules of Civil Procedure on behalf of (a) a Class of all persons who were entitled

to tender their shares pursuant to the Tender Offer Statement on Schedule TO under

Section 14(d)(1) or 13(e)(1) of the Exchange Act, filed by Lex-Win on May 25, 2007,

as Amended or Supplemented, and who suffered harm as a result of the actions

complained of herein ("Tender Offer Class"); and (b) on behalf of a Class of all persons

who are entitled to vote on the Final Proxy disseminated to investors on October 16,

2007, as Amended or Supplemented ("Proxy Class"). The Tender Offer Class and Proxy

Class are sometimes collectively referred to herein as the "Class."

42.    Excluded from the Class are the Director Defendants named herein, the

officers and directors of the Company at all relevant times, members of each Director

Defendant's immediate family, any entity in which any Director Defendant has a

controlling interest, and the legal affiliates, representatives, heirs, controlling persons,

successors, and predecessors in interest or assigns of any such excluded party.

43.    Because as of July 31, 2007, Piedmont had approximately 110,000

shareholders, members of each Class are so numerous that joinder of all members is

15

impracticable. While the exact number of Class members can only be determined through appropriate discovery, members of each Class number at least in the tens of thousands and they are geographically dispersed.

44.     Plaintiff's claims are typical of the claims of the members of each Class, because Plaintiff and all members of each Class sustained damages and/or will be harmed as a result of Defendants' wrongful conduct.

45.     Plaintiff will fairly and adequately protect the interests of all members and of each Class has retained counsel experienced and competent in class and securities litigation.  Plaintiff has no interest contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.  Plaintiff has been named as Lead Plaintiff and its counsel have been designated as Co-Lead Counsel for Plaintiff in a related action pending in this Court, *In re Wells Real Estate Investment Trust, Inc. Securities Litigation*, Civil Action No. 1:07-CV-862-CAP.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

16

47.     Final injunctive relief is appropriate with respect to the Class as a whole because the Director Defendants have acted on grounds generally applicable to the entire Class.

48.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that the Director Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

> (a)     Whether the Director Defendants violated Section 14(e) by causing a materially false and misleading Schedule 14D-9 Solicitation/ Recommendation Statement and an Amendment thereto to be issued;
>
> (b)     Whether the Director Defendants violated Section 14(a) by causing a materially false and misleading Final Proxy to be issued;
>
> (c)     Whether the Director Defendants breached their fiduciary duties to the members of the Classes by engaging in the conduct alleged herein; and
>
> (d)     Whether the members of the Tender Offer Class have sustained damages and, if so, the proper measure of such damages.

17

## VI.    SUBSTANTIVE ALLEGATIONS

49.    Cashing out of an unlisted REIT investment such as Piedmont before the Liquidity Deadline is difficult because there is no public market to sell their shares. Typically, the only options for liquidity are to sell through an inefficient secondary market or through the Company's share redemption program. ("Redemption Program")

50.    According to the Company's 2006 10-K, there is no current public market for Piedmont's common stock as it is not currently listed on a national securities exchange.  Stockholders may not sell their shares unless the purchaser meets the applicable suitability and minimum purchase requirements.  Moreover, the Company's Redemption Program includes numerous restrictions that limit a stockholder's ability to sell his or her shares to the Company and severely limits the number of shares that the Company can repurchase annually.  Moreover, "the Board of Directors may amend, suspend or terminate the share redemption program at any time upon 30 days' notice. Therefore, it will be difficult for stockholders to sell their shares promptly or at all." Further, "[i]f a stockholder is able to sell his or her shares, it would likely be at a substantial discount to the price he or she originally paid for such shares. It is also likely that our shares would not be accepted as the primary collateral for a loan.  Our shares of common stock should only be viewed as a long-term investment due to the illiquid nature of our shares."

18

51.     Effective January 29, 2007, Piedmont's then-current Board of Directors temporarily suspended redemptions under the Redemption Program until the end of March 2007 to allow stockholders to evaluate the Company's internalization of, i.e. merger with, the outside advisor.

52.     Effective April 20, 2007, Piedmont's Board of Directors suspended its Redemption Program, having concluded that Piedmont may be in possession of non-public material information arising from discussions with investment bankers and other advisers regarding the possibility of Listing its shares on a national securities exchange. Thus, at all times pertinent to this Complaint, the members of the Tender Offer Class did not have available the stock redemption program of the Company as a liquidity option.

A.     **Listing and Underwritten Offering Announcement.**

53.     On May 23, 2007, Piedmont filed a Form S-11 Registration Statement ("May 23 Registration Statement") with the SEC announcing the Company's intention to apply to list its stock on the New York Stock Exchange ("Listing") and to conduct an underwritten offering of up to $345 million of its stock ("Underwritten Offering").

54.     It is important to distinguish between the proposed Listing and the Underwritten Offering. The Listing could be accomplished by completing the necessary—and largely perfunctory—application process with a national exchange, such as the New York Stock Exchange. A Listing is essential in order to provide investors

19

with an exchange that will effectively eliminate any discount for illiquidity. The Underwritten Offering, which sought to raise $345 million, or only approximately 7% of the amount of capital raised form sale of stock to the public, was not a condition precedent to the Listing. Therefore, whether or not an Underwritten Offering could be accomplished would not interfere with the steps to be taken in effecting a Listing of the Company's stock.

55.    Contemporaneously with the filing of the May 23 Registration Statement, Piedmont publicly announced the Underwritten Offering, the Listing, and that Morgan Stanley and JPMorgan were the underwriters for the Underwritten Offering.

56.    Although the Company did not disclose how many shares would be offered or provide an estimated price range, a representative of the Company was quoted as stating that the Company "intends to use the net proceeds for general corporate and working capital purposes, including acquisition and development of office properties, and repayment of debt or repurchase of outstanding shares."

**B.    The May 25 Lex-Win Tender Offer.**

57.    On May 25, 2007, Lex-Win Acquisition LLC ("Lex-Win"), a third party, filed with the SEC a Tender Offer Statement on Schedule TO under Section 14(d)(1) or 13(e)(1) of the Exchange Act, to purchase up to 25,000,000 Piedmont shares (or

approximately 5.2% of the outstanding shares of Piedmont) at $9.00 net per share for an aggregate purchase price of $225 Million ("May 25 Lex-Win Tender Offer").

58.     Lex-Win is a Delaware limited liability company that is indirectly owned and controlled by Lexington Realty Trust ("Lexington"), a Maryland statutory real estate investment trust and Winthrop Realty Trust ("Winthrop"), an Ohio business trust. Its stated reason for making the May 25 Lex-Win Tender Offer is "to acquire a significant stake in the Company and with a view to a return on our investment. Following the conclusion of the Offer we may seek to engage in strategic transactions with the Company or acquire additional shares."

59.     According to the May 25 Lex-Win Tender Offer:

The shares do not have a readily ascertainable market value, and no one other than [Piedmont] has any accurate means to determine the actual value of shares. [Piedmont] has reported that the most recent price offered by it for shares under its recently suspended redemption program was $8.38. The net asset value attributable to the shares as determined by [Piedmont] prior to its recently consummated internalization merger, which we refer to herein as the "Internalization Merger," was $8.93 which was reduced to $8.59 as a result of the substantial dilution occasioned by the Internalization Merger. In determining our Offer Price, we (i) took both these prices into account, (ii) reviewed the Company's public filings and information on certain of the Company's properties provided to Lexington, (iii) utilized our knowledge of the Company's properties and general real estate markets in which the Company's properties are located, including the lease abstracts and other information with respect to 11 properties currently owned by the Company, and (iv) considered the substantial transaction costs associated with individual share purchases through a tender offer. We did not make an independent appraisal of the shares or the Company's properties, other than

21

our own appraisal of the 11 properties previously mentioned. Further, we took into account the illiquid nature of the shares and the potential costs associated with registering the shares or liquidating the Company as is required by Wells' Articles of Incorporation. Taking all of the foregoing into account and with a view toward making a profit, we established our Offer Price of $9.00.

60.    The May 25 Lex-Win Tender Offer stated that its offer provided

shareholders with the following benefits:

(a)    The Offer Price is **higher** than the Company's $8.59 net asset value resulting from the dilutive impact caused by the Company's recently completed internalization merger (the "Internalization Merger") to the $8.93 net asset value described in the Company's Definitive Proxy Statement on Schedule 14A filed February 27, 2007 ("Internalization Proxy");

(b)    The Offer Price is **higher** than the $8.38 per share price last offered by the Company for the redemption of shares under its share redemption program which was again suspended on April 20, 2007;

(c)    The Offer Price is **higher** than the $7.85 per share price offered by Madison Investment Trust Series 79 in its recent tender offer and the $8.50 per share price offered in the current Madison Offer;

(d)    Tendering stockholders will no longer be subject to the risks detailed in the Internalization Proxy relating to the recently completed Internalization Merger including, without limitation, immediate dilution of their shares, substantial conflicts of interest, decreases in net income per share and possible reduction in dividend levels; and

(e)    The elimination of the risk to share value created by the Incentive Plan adopted in connection with the Company's Internalization Merger.

**1.    Piedmont's Schedule 14D-9 Responds to the May 25 Lex-Win Tender Offer.**

61.    On June 8, 2007, Piedmont filed a Schedule 14D-9 Solicitation/ Recommendation Statement with the SEC pursuant to Section 14(d)(4) of the Exchange Act ("Schedule 14D-9") responding to the May 25 Lex-Win Tender Offer. The Schedule 14D-9 informed Piedmont's shareholders, the Tender Offer Class, that the "[May 25 Lex-Win Tender] Offer was not in the best interests of the stockholders of the Company and . . . recommend[ed] that the Company's stockholders reject the Offer and not tender their Shares to the Offerors pursuant to the Offer."

62.    The Board of Directors unanimously recommended that the Company's stockholders, the Tender Offer Class, reject the May 25 Lex-Win Tender Offer and not tender their shares for purchase pursuant to the Offer. The Board stated in an accompanying shareholder letter: "We believe this offer is not in the best interests of our stockholders."

63.    According to Piedmont's Schedule 14D-9, those recommendations were made by the Board of Directors, who, at a telephonic meeting held on June 4, 2007, thoroughly evaluated and assessed the terms of the May 25 Lex-Win Tender Offer together with outside advisors.

64.     The Schedule 14D-9 stated seven (7) reasons for the Board's recommendation:

> (1)     the Board's significant knowledge of the strength of the Company's assets and the belief that real estate valuations for Class A office properties have generally improved since the $8.93 net asset valuation determination made on January 3, 2007;

> (2)     discussions with financial advisors regarding the long-term potential values of the Company and its shares based on various potential future strategies;

> (3)     the current business plan in effect for the future of the Company as disclosed in the Registration Statement filed on Form S-11 with the SEC on May 23, 2007, including a potential listing of its shares of common stock on a national exchange;

> (4)     the Board's belief that the Offer represents an opportunistic attempt to deprive the Company's stockholders who tender shares in the Offer of the potential opportunity to realize the full long-term value of their investment in the Company;

> (5)     the Board's belief that the timing of the Offer is intended to take advantage of any potential increase in the value of the Company's shares associated with a possible listing and trading of the Company's shares on a national exchange;

> (6)     the amount of the consideration offered to the Company's stockholders is uncertain given that a deduction will be made from the $9.00 per share consideration equal to the aggregate amount of any dividends declared or made from any "capital transactions" and the determination of what constitutes a "capital transaction" is in the sole discretion of the Offerors; and

24

(7)     the Offer is subject to certain conditions, many of which provide the Offerors with the sole discretion to determine whether the conditions have been met, including:

- that no change or development shall have occurred or been threatened in the business, properties, assets, liabilities, financial condition, operations, results of operations or prospects of the Company that no change or development shall have occurred or been threatened in the business, properties, assets, liabilities, financial condition, operations, results of operations or prospects of the Company which, in the reasonable judgment of the Offerors, is or will be materially adverse to the Company; and

- the Offerors shall have become aware of any fact that, in the reasonable judgment of the Offerors, does or will have a material adverse effect on the value of the Company's shares.

65.     The Board of Director's recommendation to reject the May 25 Lex-Win Tender Offer was based on "(1) the Board's significant knowledge of the Company's assets; (2) the fact that the recent estimated net asset value per share determination made on January 3, 2007 was in excess of the Offer on a per share basis, and the belief that real estate valuations for Class A office properties have generally improved since that time; (3) the historical financial data disclosed on the Company's Form 10-Q and Form 10-K filings over the past few years; and (4) the current business plan in effect for the future of the Company, including a potential listing of its shares of common stock on a national exchange."

66.    The Board's recommendation that the shareholders reject the May 25 Lex-Win Tender Offer was based, in large measure, on the likelihood of a Listing.

### 2.    Lex-Win Increases the Price and Number of Shares in a Supplement to the May 25 Lex-Win Tender Offer.

67.    On June 12, 2007, Lex-Win filed a Supplement to its Tender Offer, modifying the Tender Offer as follows ("Revised Tender Offer"):

(a)    Increased the offer price to $9.30 per share, which price will not be reduced by any dividends declared or paid by the Company from and after the date of the June 12 Supplement to the Lex-Win Tender Offer ("Revised Tender Offer").

(b)    Increased the maximum number of shares Lex-Win is seeking to acquire to 45,000,000 representing 9.3% of the outstanding shares of the Company.

(c)    VII Wells Holdings, L.L.C. ("VII Wells"), an entity controlled by Starwood Capital Group Global, L.L.C. ("Starwood"), has been admitted as a member of Lex-Win.

68.    The May 25 Lex-Win Tender Offer and the Revised Tender Offer are collectively referred to herein as the "Lex-Win Tender Offer."

69.    The Lex-Win Tender Offer represented a superior liquidity vehicle for the Company's shareholders compared to any option afforded by the Company itself. The only liquidity vehicle provided by the Company was its Redemption Program, which was clearly inferior to the Lex-Win Tender Offer in at least the following respects:

a.    The Redemption Program is limited to an annual maximum of 5% of the weighted-average number of shares outstanding during the prior calendar

26

year (23.1 million in 2007), compared to Lex-Win's tender for up to 45 million shares.

b.    The Redemption Program price in 2007 was $8.38 per share ($10.00 less $1.62 in net proceeds distributed to investors per share from property sales), compared to Lex-Win's offer of $9.30 per share.

c.    The Redemption Program was not even available to investors for most of 2007, having been suspended by the Board on January 29, 2007 for two months and again on April 20, 2007.  That suspension was in effect while the Lex-Win Tender Offer was pending and, thus, that tender offer represented the only liquidity vehicle to the Company's investors during its two-month pendency.

70.    A liquidity event such as the Lex-Win Tender Offer presented a unique opportunity for Piedmont's shareholders to cash out of their investment prior to the Liquidity Deadline.  Under these circumstances, the Board of Directors, as fiduciaries of the shareholders, had a heightened duty to provide a truthful and honest recommendation to shareholders as to whether the Lex-Win Tender Offer should be accepted or rejected. The Director Defendants utterly failed in the fulfilling of either their disclosure obligations or their fiduciary duties to the Tender Offer Class, as more fully described herein.

27

71.     Ironically, the Final Proxy states the Board's intention to reinstitute the suspended Redemption Program, which will "offer liquidity to our shareholders who desire it." That statement rings hollow when one considers that just four months ago, when the Individual Defendants recognized that a Listing was unlikely, they were recommending that their investors not tender to Lex-Win for a price that was 10% higher than the Redemption Program Price.

### 3.     Piedmont Amends its Schedule 14D-9.

72.     On June 18, 2007, Piedmont filed with the SEC an Amendment No. 1 to its Schedule 14D-9 responding to the Revised Tender Offer and recommending to Piedmont shareholders that they reject the Revised Tender Offer ("Amended Response").

73.     The purpose of the Amended Response "is to amend and supplement Items 2 and 4 in the Solicitation/Recommendation Statement on Schedule 14D-9 (the "Schedule 14D-9") previously filed by Piedmont on June 8, 2007 and to add additional exhibits to Item 9 and amend the exhibit index accordingly."

74.     According to the Amended Response, "The Board of Directors, at a telephonic meeting held on June 18, 2007, thoroughly evaluated and assessed the terms of the Revised Tender Offer together with outside advisors. At such meeting the Board of Directors unanimously determined that the Revised Tender Offer was not in the best interests of the stockholders of the Company and concluded to recommend that the

28

Company's stockholders reject the Revised Tender Offer and not tender their Shares to the Offerors pursuant to the Revised Tender Offer."

75.    Item 4(c) of the Amended Response contains the reasons for the Board's recommendation with respect to the Revised Tender Offer.  The Amended Response states that its initial Item 4(c) is being "amended and supplemented."  That statement is false and misleading because Item 4(c) of the Amended Response is neither an amendment nor a supplement.  It is a <u>new list</u>, replacing the original list of reasons for the Board's recommendation in the Schedule 14D-9.  Specifically, the Amended Response repeats one reason virtually verbatim:

| Schedule 14D-9 | Amended Response |
| --- | --- |
| the Board's significant knowledge of the strength of the Company's assets and the belief that real estate valuations for Class A office properties have generally improved since the $8.93 net asset valuation determination made on January 3, 2007 | The Board has significant knowledge of the strength of the Company's assets and believes that real estate valuations for Class A office properties have generally improved since the $8.93 net asset valuation determination made on January 3, 2007 |

And, modifies certain reasons:

| Schedule 14D-9 | Amended Response |
| --- | --- |
| the Board's belief that the [May 25 Lex-Win Tender] Offer represents an opportunistic attempt to deprive the Company's stockholders who tender shares in the [May 25 Lex-Win Tender] Offer of the potential opportunity to realize the full long-term value of their investment in the Company; | The Board believes that the Revised [Tender] Offer is less than the potential long-term value of the Company's shares on a going forward basis. The Offerors also must believe in the long-term value of the Company's common stock given their initial Offer and the Revised [Tender] Offer which increased both the offer price and the number of shares being sought for purchase by the Offerors. Therefore, the Board believes that the Revised [Tender] Offer represents an opportunistic attempt to deprive the Company's |

29

| | stockholders who tender shares in the Revised [Tender] Offer of the potential opportunity to realize the full long-term value of their investment in the Company. |
|---|---|
| the [May 25 Lex-Win Tender] Offer is subject to certain conditions, many of which provide the Offerors with the sole discretion to determine whether the conditions have been met, including:<br><br>that no change or development shall have occurred or been threatened in the business, properties, assets, liabilities, financial condition, operations, results of operations or prospects of the Company which, in the reasonable judgment of the Offerors, is or will be materially adverse to the Company; and<br><br>the Offerors shall have become aware of any fact that, in the reasonable judgment of the Offerors, does or will have a material adverse effect on the value of the Company's shares. | The offer is subject to certain conditions, many of which provide the Offerors with the sole discretion to determine whether the conditions have been met, resulting in substantial uncertainty as to whether the Revised [Tender] Offer will be completed. |

And, eliminates specific language relating to the Listing and the May 23 Registration

Statement:

| Schedule 14D-9 | Amended Response |
|---|---|
| the current business plan in effect for the future of the Company as disclosed in the Registration Statement filed on Form S-11 with the SEC on May 23, 2007, including a potential listing of its shares of common stock on a national exchange. | The Board believes that the Company's current business plan in effect for the future of the Company may be more beneficial to stockholders. |

And entirely omits certain reasons related to the listing:

| Schedule 14D-9 | Amended Response |
|---|---|
| discussions with financial advisors regarding the long-term potential values of the Company and its shares based on various potential future strategies. | Omitted. |
| The Board's belief that the timing of the [May 25 Lex-Win Tender] Offer is intended to take advantage of any potential increase in the value of the Company's shares associated with a possible listing and trading of the Company's shares on a national exchange. | Omitted. |
| the amount of the consideration offered to the Company's stockholders is uncertain given that a deduction will be made from the $9.00 per share consideration equal to the aggregate amount of any dividends declared or made from any "capital transactions" and the determination of what constitutes a "capital transaction" is in the sole discretion of the Offerors.[1] | Omitted. |

76.    As set forth above, in the Amended Response the Board completely

eliminated any reference to the May 23 Registration Statement or the prospective Listing

in providing the reasons for its recommendation against tendering. The Board, however,

neither disclosed the omission of these key reasons for its recommendation nor explained

the significance of these omissions, rendering the Amended Response false and

---

[1] This reason related, in part, to the impact of dividends declared on the May 25 Lex-Win Tender Offer per share price. See ¶ 64, item (6), *supra*. Lex-Win's June 6 Amendment No. 2 mooted that reason.

misleading. Moreover, the omissions of critical reasons from the Amended Response make clear that Defendants had already determined as of June 18, that the Underwritten Offering and Listing were not likely to occur.

77.    On July 20, 2007, the Lex-Win Tender Offer expired. Lex-Win accepted for purchase 4,816,548 shares, obtaining approximately 1% of the Company's outstanding shares.

78.    On August 10, 2007, the Board disseminated a letter to shareholders indicating for the first time that Listing would be unlikely:

> Under the Company's organizational documents, we must provide liquidity to our shareholders or commence an orderly liquidation of our assets by January 30, 2008. In order to satisfy this requirement, we filed a registration statement on Form S-11 on May 23, 2007, and have taken the steps necessary to be in a position to list our shares. However, we will only pursue the listing if market conditions are appropriate. Given the challenging current market conditions, your Board, in consultation with its financial and investment banking advisors has reviewed and will continue to review all options to provide for liquidity and to maximize shareholder value. We are fortunate to have a Company with quality assets and tenants and very little leverage. These operational and balance sheet strengths provide us the flexibility to continue to review market conditions and make decisions regarding liquidity options that we believe will maximize the long-term return of our shareholders.

(Emphasis added).

**C.    The Final Proxy.**

79.    On October 2, 2007, Piedmont filed a Schedule 14A Preliminary Proxy Statement pursuant to Section 14(a) of the Exchange Act ("Preliminary Proxy") seeking an extension of the Liquidity Deadline from January 30, 2008 to July 30, 2009 and to provide the board of directors with the discretionary authority, to extend the Liquidity Deadline further from July 30, 2009 to January 30, 2011 "due to the recent turmoil in the equity and credit markets."

80.    On October 16, 2007, Piedmont filed its Definitive Proxy Statement on Schedule 14A pursuant to Section 14(a) of the Exchange Act ("Final Proxy"), soliciting shareholder approval of an amendment of the Charter to extend the Liquidity Deadline from January 30, 2008 to July 30, 2009 and, in the Board of Directors' discretion to extend the Liquidity Deadline further from July 30, 2009 to January 30, 2011.  In order to amend the Charter to extend the Liquidity Deadline as proposed, the affirmative vote of a majority of the outstanding shares of common stock is required.   Such vote is being solicited pursuant to the Final Proxy, with voting scheduled to take place on December 13, 2007.

**1.    Background to the Final Proxy**

81.    The Final Proxy set forth the timeline of events that led up to the Company's filing of the May 23 Registration Statement:

33

(a)    In early April, Morgan Stanley & Co. Incorporated and J.P. Morgan Securities met with the Piedmont Board of Directors and presented information relating to market conditions and a potential listing of its common stock.

(b)    Upon the completion of the Internalization, the Board formally engaged Morgan Stanley & Co. Incorporated and J.P. Morgan Securities Inc., ("Financial Advisors,") to continue to assist with the evaluation of a listing. Based on input from the Financial Advisors, legal advisors and Robert A. Stanger & Co. Inc. and after again considering strategic alternatives available to the Company, the board of directors determined that it was in the best interests of the Company and its stockholders to immediately pursue a listing of common stock on a national securities exchange. The Board also determined to pursue a concurrent offering of Piedmont common stock, which the Financial Advisors viewed as an important component to a successful launch of the Company onto the publicly-traded markets.

(c)    After the closing of the Internalization on April 16, 2007, the Board immediately began to take steps necessary to list Piedmont's common stock and complete a concurrent offering of its common stock. With the assistance of the Financial Advisors and legal counsel, the Board began to prepare a registration statement on Form S-11 and prospectus for the concurrent offering, which was filed with the Securities and Exchange Commission on May 23, 2007 with Morgan Stanley & Co. Incorporated and J.P. Morgan Securities Inc. as lead underwriters.

82.    According to the Final Proxy, after Piedmont filed its May 23 Registration Statement, the publicly traded REIT markets traded down and as a result, the Financial Advisors believed that the values "we would receive upon a listing and concurrent offering of our common shares could be affected by those public equity market conditions." The Board of Directors "asked the Financial Advisors to begin conducting conversations with a limited number of third parties that were financially capable of

34

consummating a strategic transaction with the company to review the values that could be obtained in a strategic transaction including a possible sale of the company and to compare those values with the potential value which was anticipated to be obtained through listing of our shares under then current market conditions."

83.    On July 12, 2007, the Financial Advisors reported to the Board of Directors the results of their conversations, indicating that the potential buyers contacted confirmed management's view of valuation for the assets of the company, but that none of these potential buyers was interested at that time in pursuing the acquisition of the company as a whole.

84.    According to the Final Proxy, in late July, the credit markets continued to deteriorate, and the Piedmont Board of Directors observed a steep decline in valuations of public REIT stocks. During the week of July 23, 2007, the Morgan Stanley REIT Index ("MSCI US REIT Index") dropped 8.9%, bringing the decline in the MSCI US REIT Index in the period from Internalization on April 16, 2007 to August 3, 2007 to 19.1%.

85.    According to the Final Proxy, at a meeting held on August 6, 2007, the Board of Directors continued to discuss potential strategic alternatives available to the company given the deteriorating capital market conditions, including a potential Listing of common stock. At such meeting, the Financial Advisors reported to the Board of Directors their view that "given the then-current equity market environment and recent

35

credit market disruptions, Piedmont's stock would likely trade at a significant discount to the long-term value of the company if the company opted to proceed with a listing of our stock under the then-current capital market conditions, whether or not the listing included a concurrent offering of our common stock." Given these market conditions, the Board of Directors says it determined to postpone any Listing and to re-evaluate, with the advice of the Financial Advisors, the company's strategic options in early September.

86.    On September 12, 2007, the Board of Directors met with and received a report from the Financial Advisors on capital market conditions, which had not materially improved since the August 6 meeting due to continued turmoil in credit markets prompted by concerns regarding sub-prime mortgage defaults among other things. Based on this input, the Board of Directors determined that "it was in the best interests of the company and our stockholders to delay the listing and concurrent offering of our common stock and not pursue a listing without a concurrent offering of our common stock until the public real estate equity markets have stabilized."

### 2.    Stated Reasons for the Board's Recommendation on the Proposal

87.    The Board of Directors discussed the approaching Liquidity Deadline and determined that "being required to pursue a listing (whether or not the listing included a concurrent offering of our common stock), sale of assets or any other strategic transaction

36

prior to the current Liquidity Deadline in light of the current capital market conditions
might adversely affect our ability to effectively maximize stockholder value."

88.    According to the Final Proxy, the "Board has concluded that listing in an
unsettled market at a price significantly below the long-term value of the company would
not be in the best interests of our stockholders because, among other things, it could
adversely affect (1) the level at which our common stock might be traded thereafter in
more stabilized environments, (2) the view of the fundamental value of the company, not
only from the perspective of our stockholders but also potential acquirors, (3) our cost of
capital when using stock as consideration for acquisition opportunities, joint venture
arrangements and strategic partnerships and (4) the perceived leverage level of the
company by lenders and, as a result the potential for higher cost of new debt financings."

89.    According to the Final Proxy, the Board of Directors believes that it is "in
the best interests of the stockholders" to begin the process to amend the Charter to extend
the Liquidity Deadline.  The Final Proxy also states that he Board of Directors considered
various time periods for extension and determined to extend initially from January 30,
2008 to July 30, 2009 in order to allow time for market conditions to improve.  However,
the Board of Directors also thought, as stated in the Final Proxy, that it was "prudent to
request the flexibility to further extend the Liquidity Deadline to January 30, 2011,

37

without further stockholder approval to the extent the Board of Directors determines that such further extension is necessary to effectively maximize stockholder value."

90.     According to the Final Proxy, "The board of directors' determination as to time periods was based on input from [the] Financial Advisors that timeframe would likely be enough time for the public equity markets and credit markets to stabilize and for the board of directors to be able to effect a successful listing of [Piedmont's] common stock, or if such listing is not expected to effectively maximize stockholder value at such time, to evaluate and pursue a sale of [the] company or other strategic transaction."

91.     According to the Final Proxy, if the proposal to extend the Liquidity Deadline is approved "[its] Board of Directors intends to continue to review all available strategic options for the company including a listing of [its] common stock, or a merger, business combination, portfolio asset sale or a liquidation of [its] assets. Any one of these or other strategic alternatives may be pursued at any time including prior to January 30, 2008 if [the] Board of Directors determines that it is in the best interest of the company and its stockholders to do so."

92.     If the proposal to extend the Liquidity Deadline is not approved, the Board of Directors intends to consider all of its options prior to January 30, 2008, including a Listing of the common stock, and if a Listing or other strategic alternative is not pursued

38

prior to January 30, 2008, the Company will commence an orderly process of liquidation in accordance with its Charter.

93.    In an effort to accommodate potential interim liquidity needs of some stockholders, the Board of Directors intends to reinstate the Company's share redemption program in the fourth quarter of 2007.

94.    The Board of Directors unanimously approved the amendment to the Charter to extend the Liquidity Deadline.

### D.    The Board of Directors Violated Federal Securities Laws By Filing Documents with the SEC that Were Materially False and Misleading and Omitted Material Facts.

95.    Because Piedmont's securities have never been listed on any securities exchange, it generally operates outside the realm of a public market that responds to market conditions and analysts' commentary, and its investors rely entirely on the accuracy and completeness of the disclosures provided in Piedmont's SEC filings for information about the Company, its business, it finances, and the value of its securities. Absent from the body of investor information available about Piedmont stock in the marketplace, therefore, is the type of in-depth analysis that institutions generate about market-traded securities.

1.    **The Schedule 14D-9 and the Amended Response Failed to Disclose that the Board Knew that There was a High Likelihood that the Company Would Not List.**

96.    In the Schedule 14D-9, the Board recommended that shareholders reject the May 25 Lex-Win Tender Offer as unacceptable based on "discussions with financial advisors regarding the long-term potential values of the Company and its shares based on various potential future strategies," and "the current business plan in effect for the future of the Company as disclosed in the Registration Statement filed on Form S-11 with the SEC on May 23, 2007, including a potential listing of its shares of common stock on a national exchange." The only reasonable inference was that the Board of Directors had knowledge that the Company's stock would be listed and the Company would be priced on the market at a higher per share price than what Lex-Win was offering.

97.    In addition, the Board recommended rejecting the May 25 Lex-Win Tender Offer based on the "Board's belief that the timing of the Offer is intended to take advantage of any potential increase in the value of the Company's shares associated with a possible listing and trading of the Company's shares on a national exchange." The implication was that Lex-Win was trying to steal the shares at a low price and would benefit from a future Listing where the stock would be priced higher than the May 25 Lex-Win Tender Offer price.

40

98.    The Schedule 14D-9 made clear that the Board's recommendation was

based, in large measure, on the likelihood of a Listing and its pending May 23

Registration Statement. Ten days later, on June 18, the Board of Directors filed their

Amended Response to Lex-Win's Revised Tender Offer. Again, the Board of Directors

recommended that shareholders reject the Lex-Win Tender Offer. However, this time

their reasoning for the recommendation was different, eliminating any reference to a

Listing or the May 23 Registration Statement. The Amended Response did not mention

the omission of the dropped reasons or explain the significance of their omission. It is

apparent that as of June 18, 2007, the Director Defendants were aware that the Listing of

the Company's stock was so unlikely to occur that they could no longer refer to it as a

reason not to tender.

99.    The unlikelihood of a Listing was withheld until the August 10, 2007 letter

to investors, just three weeks after the expiration of the Lex-Win Tender Offer. Director

Defendants rendered their Schedule 14D-9 and Amended Response materially false and

misleading by failing to disclose and supplement those documents with these material

facts prior to the expiration of the Lex-Win Tender Offer on July 20, 2007.

100.    The Board's responsibilities did not end on June 18 when they filed their

Amended Response. Rather, the Director Defendants had an obligation to modify or

correct or alter their recommendation based upon any new information or belief learned prior to the expiration of the Lex-Win Tender Offer on July 20, 2007.

101.    Indeed, in his letter to investors dated June 18, 2007 containing the Board's recommendation (attached as Ex. (a)(2) to the Amended Response), Defendant Miller states: "We strongly recommend that you access our Web site at www.wellsreit.com for updates on additional matters." But, the website link did not contain any additional useful or material information to the Tender Offer Class.

102.    The Schedule 14D-9 and the Amended Response contained false and misleading statements which effectively misled the majority of shareholders to reject the Lex-Win Tender offer. This is evidenced by the fact that only 1% of the shares were tendered in response to the Lex-Win Tender Offer.

103.    The Director Defendants also failed to disclose the then-current value or likely market price of the Company's shares in comparison to the Lex-Win Tender Offer Price. The Director Defendants were in possession of such information, according to their own statements about their purportedly frequent consultations with Financial Advisors and other related activities. *See* ¶¶ 81-86, *supra.* Specifically, it is known that as recently as July 12, 2007, the Financial Advisors reported to the Board of Directors the results of conversations with third parties regarding the values that could be obtained in a strategic transaction including a possible sale of the Company, indicating that the

42

potential buyers contacted "confirmed management's view of valuation for the assets of the company." *Id.*

104.   Given that these shares were not publicly traded on an efficient market, nothing could have been more important to an investor in deciding whether to tender their shares to Lex-Win than the value or likely market price of their shares.  The Director Defendants withheld that information and instead told the investors the Lex-Win Tender Offer "is less than the potential long-term value of the Company's shares on a going forward basis."  That statement is false and misleading because "long-term value" is meaningless in terms of providing the investors with an apples-to-apples comparison of current value of the shares, an amount known only to the Director Defendants and their advisors, to the Lex-Win Tender Offer per share price.

### 2.     The Final Proxy Contains Materially False and Misleading Statements Concerning the Reason for the Board's Decision to Delay the Listing and Extend the Liquidity Deadline.

105.   The Final Proxy stated that the key reasons for proposing to extend the Liquidity Deadline included turmoil in credit markets prompted by concerns regarding sub-prime mortgage defaults and turbulent public equity market conditions that could negatively impact the market price of the Company's stock upon Listing. Primarily based on these avowed factors, the Board of Directors determined that it was in the best interests of the Company and its stockholders to delay the Listing and concurrent offering

43

of common stock, and not to pursue a Listing without a concurrent offering of common

stock until the public real estate equity markets had stabilized.

106.    The Director Defendants' citation to market conditions and the credit crunch

as reasons for delaying the Listing and seeking an extension of the Liquidity Deadline is

a subterfuge for at least the following reasons:

(a)    The Board knew it was unlikely that the Company would list its stock at
least as early as June 18, one month prior to the "steep decline in valuations
of public REIT stocks," when the Amended Response dropped the listing
and the S-11 as reasons for their recommendation that shareholders reject the
Lex-Win Tender Offer. By October 2, 2007, the date it filed its Preliminary
Proxy, the REIT market had stabilized itself. In fact, the MSCI US REIT
Index was at almost the identical levels on October 2, 2007 as it was on May
23, 2007, the date the Company filed its S-11 with the SEC.

(b)    REIT market conditions have not affected the fundamental values of
commercial properties.  The market price for shares of REITs does not
necessarily mirror the underlying value of commercial real estate.  Indeed,
the financial press has uniformly reported that the commercial real estate
market has not been affected by the decline in the residential real estate
market.  In fact, the commercial real estate market remains strong, seeing
rising rents and occupancy levels.   Further, the REIT market has rebounded
from the decline in valuations of public REIT stocks in July and August
2007.

(c)    Moreover, despite using the REIT market conditions as a reason for delaying
a liquidity event, the Board of Directors has recently announced its decision
to sell 10 properties consisting of 25% of the Company's portfolio measured
by total square footage to take advantage of the upbeat commercial real
estate market.  Among the properties Piedmont has offered in this partial
liquidation is one considered a "gem," the 761,000 square foot office
building at 1901 Market Street in Philadelphia. If commercial real estate
values have been negatively impacted by credit or public equity market

"turmoil" and "turbulence," it is difficult to explain the timing of Piedmont's partial liquidation of its portfolio.

3.    One of the real reasons that the Director Defendants are recommending and seeking an extension of the Liquidity Deadline is to prevent the Director Defendants from being exposed for wrongfully recommending to their shareholders that they reject the Lex-Win Tender Offer.

### E.    Director Defendants Breached The Fiduciary Duties Owed to the Shareholders by Acting Without Consideration to What Was in the Best Interests of the Shareholders.

107.    Based on the failure of the Board of Directors to disclose the information that the Company was unlikely to list, or that if did, it would come to market at a price below that which was offered by Lex-Win in its Tender Offer, it is evident that the Director Defendants have acted with only one goal in mind, to protect their interests at the expense of the Piedmont shareholders.

108.    When faced with material facts implicating the terms of the Lex-Win Tender Offer and appropriateness of recommending that shareholders reject or tender their shares pursuant to the Lex-Win Tender Offer, Director Defendants stayed their course of recommending that the Piedmont shareholders reject the tender.  The Director Defendants accomplished this by presenting the materially false and misleading Schedule 14D-9 and Amended Response, both of which failed to consider the fact that stockholders were promised liquidity by January 30, 2008 and that Listing was uncertain.  Further, the

45

Director Defendants failed to evaluate, consider, investigate and respond to the Lex-Win Tender Offer in a manner consistent with prudent business judgment. The Director Defendants, instead, concealed material information—namely the already determined high unlikelihood of a Listing before the Liquidity Deadline--from the Piedmont shareholders.

109.   The Director Defendants also orchestrated their Schedule 14D-9 and Amended Response in a manner that was intended to prevent Lex-Win from gaining control over a significant percentage of Piedmont stock. The Director Defendants' efforts to entrench themselves and retain control over the Company should not have prevented the Directors from adhering to their fiduciary duties and attempting to secure an effective liquidity option for the shareholders.

110.   The Director Defendants, individually and collectively, owe and owed to Piedmont's shareholders the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Piedmont and in the use and preservation of Piedmont's property and assets.

111.   The recommendation that shareholders reject the Lex-Win Tender Offer while aware (or wrongfully disregarding) that it was unlikely that the Company would list placed the Director Defendants' own personal self-interest above Piedmont's shareholders' best interests.

## VI. <u>COUNTS</u>

## <u>COUNT I</u>

## <u>BY TENDER OFFER CLASS AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATIONS OF SECTION 14(e) AND RULE 14 e-2(b)</u>

112.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 14(e) claim.

113.    This Count is asserted under § 14(e) of the Exchange Act § and Rule 14e-2(b) promulgated thereunder on behalf of the Tender Offer Class against the Director Defendants.

114.    The Director Defendants provided information which was contained in a 14D-9 Solicitation/Recommendation Statement and an Amendment thereto.

115.    Section 14(e), 15 U.S.C. §78n(e), states that is "unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and

regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

116.    The Director Defendants sought to prevent shareholders from tendering shares by means of a 14D-9 Solicitation/Recommendation Statement which contained false and misleading statements concerning, *inter alia*, the likelihood that Piedmont would list its stock and at what price, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

117.    The Director Defendants failed to supplement or update its 14D-9 Solicitation/Recommendation Statement to make their statements contained therein not false and misleading, in violation of SEC Rule 14e-2(b), 17 C.F.R. § 240.14e-2(b), which requires that with respect to a tender offer, when a material change occurs in the disclosure recommending acceptance or rejection of a tender offer, "the subject company shall promptly publish or send or give a statement disclosing such material change to security holders."

118.    These misrepresented or omitted facts are material, because, under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false or misleading statements or omitted facts important in deciding whether to tender their shares, including:

(a)    the then-current value or likely market price of the Company's shares in

comparison to the Lex-Win Tender Offer price.  The Director Defendants

were in possession of such information, according to their own statements

about their purportedly frequent consultations with Financial Advisors and

other related activities.  Given that these shares were not publicly traded on

an efficient market, nothing could have been more important to an investor

in deciding whether to tender their shares to Lex-Win than the value or

likely market price of their shares.  The Director Defendants withheld that

information and instead told the investors the Lex-Win Tender Offer "is less

than the potential long-term value of the Company's shares on a going

forward basis."  That statement is false and misleading because it is

meaningless in terms of providing the investors with an apples-to-apples

comparison of current value of the shares, an amount known only to the

Director Defendants and their advisors, to the Lex-Win Tender Offer per

share price;

(b)    that, during the pendency of the Lex-Win Tender Offer, the Listing of the

Company's stock before the Liquidity Deadline was highly unlikely;

(c)    that in light of the unlikelihood of a timely Listing and the absence of

other viable liquidity options, the Lex-Win Tender Offer  constituted a

49

reasonable and prudent exit strategy that shareholders should seriously consider as a liquidity option; and

(d)     the reason for their omitting two critical reasons—the May 23 Registration Statement and the prospective Listing—from the Amended Response, in support of their recommendation to shareholders against acceptance of the Lex-Win Tender Offer.

119.   The Schedule 14D-9 and Amended Response were materially false and misleading based on the allegations contained above, specifically in Section V.D.1.

120.   Each of the matters described in Section V.D.1. would have been considered by a reasonable investor, separately and not in the aggregate, to have been material to his or her decision in voting on the matters presented in the Final Proxy, and to have been a material part of the mix of information upon which such decisions were made. By reason of the foregoing, the Schedule 14D-9 and Amended Response are materially false and misleading, in violation of Section 14(e) of the Exchange Act and the rules and regulations promulgated thereunder.

121.   None of the Director Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Schedule 14D-9 and Amended Response were true, without omissions of any material

facts, and not misleading. Specifically, the Director Defendants named in this Count are liable under Section 14(e) of the Exchange Act for the following reasons:

(a) The Director Defendants, as directors and/or officers of Piedmont, allowed their names to be used in the Schedule 14D-9 and Amended Response. The use of their names was not incidental, but rather material in connection with the recommendation that stockholders reject the offer to tender their shares pursuant to the Lex-Win Tender Offer. The use of their names lent substantial and material support to the recommendation; and

(b) Director Defendant Miller signed the Schedule 14D-9 and Amended Response, as well as accompanying explanatory letters to shareholders that contained the Board's recommendation to reject the Lex-Win Tender Offer.

122.    As a result of these Securities violations, the Tender Offer Class Members are threatened with irreparable injury, for which there is no adequate remedy at law, as well as substantive economic damages.

51

## COUNT II

## BY THE PROXY CLASS AGAINST THE DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(a) AND RULE 14a-9

123.   Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 14(a) claim.

124.   This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of the Proxy Class against the Director Defendants.

125.   The Director Defendants, as more fully set forth below, provided information which was contained in the Final Proxy, allowed their names to be used in connection with the Final Proxy and the solicitation of votes, solicited votes under the Final Proxy, and caused the Final Proxy to be disseminated to the Proxy Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

126.   Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

127.   SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false and misleading."

128.   The Director Defendants are seeking to solicit votes from Plaintiffs and members of the Class by means of a Final Proxy Statement which contains false and misleading statements concerning, *inter alia*, the reasons for delaying Piedmont's Listing and extension of the Liquidity Deadline, and omitted to state material facts which were necessary to make their statements contained therein not false and misleading, as alleged above.

129.   These misrepresented or omitted facts are material, because, under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false or misleading statements or omitted facts important in deciding how to vote on the Final Proxy or a material part of the mix of information available to Proxy Class members in deciding how to exercise their voting rights, including:

(a)    The reasons for the extending the Liquidity Deadline and whether an extension is in the best interests of the shareholders and the Company  if some exit strategy other than a Listing

53

materializes (such as a buyout of the shareholders' interests or a
liquidation of the Company);

(b)    The alternatives to a Listing or extension that were explored in
context of evaluating and recommending the extension of the
Liquidity Deadline, such as the Company liquidating, or the
Company engaging in business combination, or buyout of the
shareholders' stock; and

(c)    The results of conversations with potential buyers in June and
July 2007 which confirmed managements' view of valuation
for the assets of the Company.

130.    The Final Proxy is materially false and misleading based on the allegations
contained above, specifically in Section V.D.2.

131.    Each of the matters described in Section V.D.2. would have been considered
by a reasonable investor, separately and not in the aggregate, to have been material to his
or her decision in voting on the matters presented in the Final Proxy and to have been a
material part of the mix of information upon which such decisions were made. By reason
of the foregoing, the Final Proxy is materially false and misleading, in violation of
Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder.

132.    None of the Director Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Final Proxy were true, without omissions of any material facts, and not misleading. Specifically, the Director Defendants named in this Count are liable under Section 14(a) of the Exchange Act for the following reasons:

(a)    The Director Defendants as directors and/or officers of Piedmont, allowed their names to be used in the false and misleading Final Proxy, in connection with the solicitation of votes regarding the matters to be voted upon in the Final Proxy, and affirmatively recommended in the Final Proxy that shareholders vote in favor of all of the proposals contained in therein;

(b)    The Director Defendants allowed their names to be used in connection with the solicitation of votes regarding the matters to be voted upon in the proxy materials and allowed a description of their backgrounds and other relevant information to be used in the Final Proxy. The use of their names was not incidental, but rather material in connection with the solicitation of votes regarding all of the matters to be voted upon in the proxy materials, including, but not limited to, their standing for election as directors of Piedmont. The use of their names lent substantial and material support to

the other matters to be voted upon and which were recommended for affirmative action by Piedmont's Board of Directors;

(c)     Director Defendant Miller signed the Final Proxy, as well as an accompanying explanatory letter to shareholders (which was part of the Final Proxy solicitation materials) that contained the Board's recommendation in favor of each proposal for which proxies were being sought by Piedmont; and

(d)     The Director Defendants, directly, or through the employ of others, solicited votes for the matters to be voted upon in the Final Proxy.

133.   As a result of these Proxy violations, the Proxy Class members are threatened with irreparable injury, for which there is no adequate remedy at law.

## COUNT III

### BY THE TENDER OFFER CLASS AGAINST THE DIRECTOR DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

134.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

56

135.   The Director Defendants are all members of the Board of Directors of Piedmont. As such, the Piedmont Articles of Incorporation provide that they "have a fiduciary duty to the shareholders of the Company."

136.   The Director Defendants, individually and collectively, owe and owed to the Tender Offer Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Piedmont and in the use and preservation of Piedmont's property and assets. Further, said defendants owed a duty to the shareholders not to place their own personal self-interest above the Piedmont shareholders' best interests.

137.   To discharge those duties, the Director Defendants were required to exercise prudent supervision over Piedmont's management, policies, practices, controls, and financial and corporate affairs.

138.   As alleged in this Complaint, each of the Director Defendants breached his fiduciary duties to the Class members by failing to recommend that in light of the unlikelihood of a timely Listing and the absence of other viable liquidity options, the Lex-Win Tender Offer constituted a reasonable and prudent exit strategy that shareholders should seriously consider as a liquidity option.

139.   As alleged in this Complaint, each of the Director Defendants breached his fiduciary duties to the Tender Offer Class members by failing in the Schedule 14D-9 and

57

Amended Response to fully inform the stockholders about the likelihood of a liquidity event and utilizing their fiduciary position to recommend against tendering shares in order to retain control over the Company.

140.    Each of the Director Defendants breached his fiduciary duties to the Class members by disseminating a materially false and misleading Schedule 14D-9 and Amended Response and failing to disclose the reason for their omitting two critical reasons—the May 23 Registration Statement and the prospective Listing—from the Amended Response, in support of their recommendation to shareholders against acceptance of the Lex-Win Tender Offer, and failing to supplement their disclosures in the face of contrary information.

141.    Each of the Director Defendants breached his fiduciary duties to the Tender Offer Class members by failing to assure that the administrative procedures, operations and programs of the Company are in the best interests of the shareholders and are fulfilled.

142.    The shareholders suffered injury to their individual economic interests as a result of the wrongful conduct of the Director Defendants.

143.    As a direct and proximate result of those breaches of fiduciary duties, the Tender Offer Class members have suffered damages.

## COUNT IV

## BY THE PROXY CLASS AGAINST THE DIRECTOR DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

144.    Plaintiff repeats and realleges the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

145.    The Director Defendants are all members of the Board of Directors of Piedmont.  As such, the Piedmont Articles of Incorporation provide that they "have a fiduciary duty to the shareholders of the Company."

146.    The Director Defendants, individually and collectively, owe and owed to the Proxy Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Piedmont and in the use and preservation of Piedmont's property and assets. Further, said defendants owed a duty to the shareholders not to place their own personal self-interest above the Piedmont shareholders' best interests.

147.    To discharge those duties, the Director Defendants were required to exercise prudent supervision over Piedmont's management, policies, practices, controls, and financial and corporate affairs.

148.    As alleged in this Complaint, each of the Director Defendants breached his fiduciary duties to the Proxy Class members by failing to assure that the administrative

59

procedures, operations and programs of the Company are in the best interests of the shareholders and are fulfilled.

149.   Each of the Director Defendants breached his fiduciary duties to the Class members by failing to determine whether the extension of the Liquidity Deadline is in the best interest of the shareholders.

150.   Each of the Director Defendants breached his fiduciary duties to the Class members by placing their own personal self-interests above the Class members' best interests, and by seeking to conceal their fiduciary failures by means of a false and misleading Final Proxy.

151.   Each of the Director Defendants breached his fiduciary duties to the Class members by disseminating a materially false and misleading Final Proxy.

152.   The shareholders suffered injury to their individual economic interests and their voting rights as a result of the wrongful conduct of the Director Defendants.

153.   As a direct and proximate result of those breaches of fiduciary duties, the Proxy Class Members have suffered damages.

## VII.  **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment as follows:

A.    An order certifying the Classes as set forth herein and designating Plaintiff as the representative thereof;

B.    An order declaring the Final Proxy to be materially false and misleading in violation of Section 14(a) of the Securities Exchange Act of 1934;

C.    An order declaring the 14D-9 Solicitation/Recommendation Statement and the Amendment thereto to be materially false and misleading in violation of Section 14(e) of the Securities Exchange Act of 1934;

C.    An order declaring the conduct of the Defendants to be in violation of law as set forth herein;

D.    An order declaring any authorizations secured by Defendants pursuant to the false and misleading Final Proxy, null and void, and requiring that any resolicitation of shareholder votes shall be pursuant to Court supervision and Court-approved proxy materials;

E.    An order awarding Plaintiffs and members of the Classes compensation for the damages which they have sustained as a result of Defendants' unlawful conduct;

61

F.    An order compelling a valuation of the Company by a Court-appointed expert in order to assist the Court in framing appropriate equitable relief, including whether and when to compel Listing of the Company's stock or liquidation of the Company.

G.    An order compelling the Director Defendants to fund or arrange for a tender offer whereby the Tender Offer Class will be offered the opportunity to tender up to 8.3% of their shares in exchange for the greater of $9.30 per share, plus interest, or the current value of their shares.

H.    An order awarding Plaintiffs reasonable attorneys' fees, experts' fees, interest and cost of suit; and

I.    Such other and further relief as this Court may deem just.

## PLAINTIFFS DEMAND A JURY TRIAL

Dated:    October 25, 2007

CHITWOOD HARLEY HARNES LLP

By:    _Robert W. Killorin_

Robert W. Killorin
Meryl W. Edelstein
Krissi T. Gore
Michael R. Peacock
2300 Promenade II
1230 Peachtree Street, NW
Atlanta, GA 30309
Telephone: (404) 873-3900
Facsimile: (404) 876-4476
rkillorin@chitwoodlaw.com

62

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
CHIMICLES & TIKELLIS LLP
One Haverford Centre
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Lawrence A. Sucharow
Christopher Keller
Joseph Sternberg
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

Lawrence P. Kolker
Alexandra R. Silverberg
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

Thomas C. Michaud
Jack Timmony
VANOVERBEKE MICHAUD &
  TIMMONY, P.C.
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578- 1200

*Counsel for Plaintiff Washtenaw County
Employees' Retirement System*

63

## VERIFICATION OF PLAINTIFF

I, William Goebel, as Chair of the Washtenaw County Employees Retirement System, ("Washtenaw County ERS"), declares:

Washtenaw County ERS purchased shares of Piedmont Office Realty Trust, Inc. ("Piedmont") as set forth in the attached Certification and continues to hold shares of Piedmont. I reviewed the Complaint and authorized counsel to file the Complaint. This action is not collusive to confer jurisdiction on the United States, which it would not otherwise have.

I hereby verify that Washtenaw County ERS is a plaintiff in this action. I hereby verify that the facts stated in the Complaint are true and correct to the best of my knowledge, information, or belief.

I declare the above to be true under the penalty of perjury.

Dated: 10/24/07

William Goebel
*Chair, Washtenaw County Employees Retirement System*

## CERTIFICATION

I, William Goebel, as Chair of the Washtenaw County Employees Retirement System, ("Washtenaw County ERS") hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Washtenaw County ERS.  I have reviewed a complaint prepared against Piedmont Office Realty Trust, Inc. ("Piedmont") alleging violations of the federal securities laws;

2.      Washtenaw County ERS did not purchase securities of Piedmont at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Washtenaw County ERS is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.      Washtenaw County ERS purchased and currently owns 1,274,794.441 common shares in Piedmont for which Washtenaw County ERS may vote on the proposals presented in the Schedule 14A Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), filed with the Securities Exchange Commission ("SEC") on October 16, 2007.  Washtenaw County did not tender any of its shares pursuant to the Tender Offer Statement on Schedule TO under Section 14(d)(1) or 13(e)(1) of the Exchange Act, filed by Lex-Win Acquisition, LLC on May 25, 2007, as amended or supplemented.

5.      Washtenaw County ERS is currently serving as a representative for a class in the following action filed under the federal securities laws during the last three years prior to the date of this Certification: *In Re Wells Real Estate Investment Trust, Inc. Securities Litigation*, Civ. No. 1:07-cv-00862-CAP (N.D. Ga.);

6.     Beyond its pro rata share of any recovery,  Washtenaw County ERS will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct this 24th day of October, 2007.

William Goebel
**William Goebel**
*Chair, Washtenaw County Employees*
*Retirement System*

2